IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOORE, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>STATE OF CALIFORNIA, et al.<br><br>    Defendants.<br>_____ | CIV. S-94-153 DFL GGH<br><br>MEMORANDUM OF OPINION<br>AND ORDER |
| PRICE, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>STATE OF CALIFORNIA, et al.<br><br>    Defendants. | CIV. S-94-154 DFL GGH<br><br>MEMORANDUM OF OPINION<br>AND ORDER |

    Plaintiffs Leslie Price, et al. move for a *cy pres* distribution of unclaimed funds resulting from a class action settlement with the State of California ("State"), California Department of Corrections ("CDC"), and the California Department of Mental Health ("CDMH"). Plaintiffs Jones M. Moore, et al. move for a *cy pres* distribution of unclaimed funds resulting from

a class action settlement with the State and the California Department of Youth Authority ("CDYA"). All plaintiffs seek to distribute the unclaimed settlement funds to the Legal Aid Society-Employment Law Center ("LAS-ELC"). For the reasons discussed below, plaintiffs' motions are DENIED. The funds shall escheat to the State.

I.

A.  Price

On January 28, 1994, the Price plaintiffs filed a class action against the State, the CDC, and the CDMH for failure to pay overtime wages required by the Fair Labor and Standards Act ("FLSA"). Approximately 7,104 individuals opted to join the class. (Price Mot. at 2.) On October 10, 1996, the parties entered into a settlement agreement. (Id. Ex. A.)

The settlement agreement provided for a $10,129,500.00 award from the CDC and a $97,500.00 award from the CDMH. (Id. at 5.) As part of the settlement, plaintiffs' attorney Gary Messing received $450,000.00 in statutory attorney's fees. (Id. at 7.) The fee agreement between the Price plaintiffs and Messing obligated him to distribute 75% of these fees, or $337,500.00, to the class members. (Price Messing Decl. ¶ 7.) Messing held this amount in trust until defendants determined the number of eligible employees. (Id.)

On December 20, 1996, all claims were settled and defendants determined that 6,855 employees were eligible to receive a portion of the award. (Id.) Messing distributed the $337,500.00

2

from his trust fund to the eligible employees by sending each one a check for $48.50.  (Id.)  As of July 14, 2005, 392 checks had been returned or remained uncashed.  (Id.)  As a result, Messing's trust account contains $19,012.00 in unclaimed funds.  (Id.)

B.  Moore

Also on January 28, 1994, the Moore plaintiffs filed a class action against the State and the CDYA for failure to pay overtime wages.  Approximately 1,106 individuals opted to join the class.  (Moore Mot. at 2.)  On July 3, 1996, the parties entered into a settlement agreement.  (Id. Ex. A.)  In addition to other relief, the settlement agreement provided eligible employees with "liquidated damages" equaling 32 hours of paid work time.  (Id. at 3.)  The State and the CDYA paid these awards directly to Messing.  (Moore Messing Decl. ¶ 7.)  After withdrawing his share, Messing sent each eligible employee a check for the remainder.  (Id.)

Around October 1999, Messing concluded that several employees had not cashed these checks.  (Id.)  Despite Messing's efforts to find and compensate these class members over the past several years, sixteen remained unlocated as of July 14, 2005.  (Id. ¶¶ 7, 8.)  As a result, Messing's trust account contains $3,435.81 in unclaimed funds.  (Id. ¶ 7.)

II.

There are just over $22,400 in unclaimed funds in these two litigations and the question for resolution is what to do with

3

the funds.  In Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990), the Ninth Circuit recognized that "[m]ost class actions result in some unclaimed funds."  The panel held that the district court which certified the class action "was required to formulate a procedure for distributing unclaimed funds."  Id.  The panel identified three alternatives: "1) cy pres or fluid distribution, 2) escheat to the government, and 3) reversion to defendants."  Id.  The panel stated that a court's decision should be "guided by the objectives of the underlying statute and the interest of the silent class members."  Id.  However, "[f]ederal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds."  Id.

Plaintiffs move to distribute the funds to the LAS-ELC under the *cy pres* doctrine.  (Price Mot. at 6-8.)  A *cy pres* distribution must provide the "next best" result for the unlocated class members.  Six Mexican Workers, 904 F.2d at 1308. In Six Mexican Workers, the Ninth Circuit reversed the district court's decision to distribute unclaimed funds to a non-profit organization because the class members would not likely benefit from the distribution.  Id. at 1309.  The court declared that a proper *cy pres* distribution will narrowly target the class members.  Id.

A *cy pres* distribution to the LAS-ELC is not as likely to benefit class members as permitting the funds to escheat to the State.  The LAS-ELC is a non-profit public interest law firm in

4

San Francisco devoted to employment issues.  (Graff Decl. ¶ 6.) It would use the award to fund representation of low-income workers in the San Francisco Bay Area.  (Id. ¶ 11.)  Conversely, the unlocated class members in these actions are middle-income state workers scattered throughout California.  Thus, a distribution to the LAS-ELC would not likely benefit class members in any reasonably direct fashion.

By comparison, permitting the funds to escheat to the State offers the distinct possibility that the funds eventually will be claimed by the class members who own the funds.  It is important to remember that both of these class actions were "opt in" classes in which identifiable plaintiffs took the affirmative step of including themselves in the actions.  Although the court does not agree with defendants that Cal. Civ. Proc. Code § 1518 is controlling in a federal action, the court finds that the escheat mechanism under § 1518 is the solution most in the interest of class members who have yet to claim their share of the settlement.  Escheated funds are deposited to the State Controller's Office.  The Controller must mail and publish notice to the owners.  Id. § 1531.  Any owner may reclaim the money upon proving ownership.  Id. §§ 1501.5, 1560(b).  The Controller has access to addresses and databases that have not been available to the parties;  in addition, the Controller maintains a web site that persons can visit to determine whether the State is holding any unclaimed funds that belong to them.  Although this is not a perfect solution, it is the best one in the circumstances and the

one most likely to benefit the actual owners of the funds.

Plaintiffs argue that <u>Six Mexican Workers</u> forbids the court from ordering the funds to escheat to the State because that would be equivalent to returning the funds to defendants. 904 F.2d at 1308. However, under § 1518, defendants do not acquire title to the funds. Although the Controller can use the money until it is claimed, escheat to the State ultimately increases the probability that the unlocated class members will receive their awards. The court finds that the increased likelihood of compensating the class members outweighs the concerns plaintiffs raise.

### III.

Plaintiffs' motion for a *cy pres* distribution of unclaimed funds to the Legal Aid Society-Employment Law Center is DENIED. The funds shall escheat to the State under Cal. Civ. Proc. Code § 1518.

IT IS SO ORDERED.

Dated: 11/21/2005

_/s/ David F. Levi_
DAVID F. LEVI
United States District Judge